And the court will proceed to the second case of the day, Miller v. Downey. Mr. Birnbaum. Good morning, your honors, and may it please the court. I'm Sam Birnbaum with Jenner & Block, and I represent the appellant, Mr. Joseph Miller. This case is about a prison that banned its prisoners from receiving and reading newspapers, and whether that policy was lawful under the First Amendment. The district court in this case erred in granting summary judgment to defendants, and so Mr. Miller is entitled to compensation for his lost newspapers. What if prisoners could request newspapers and the prison would subscribe to a supply of, let's say, the 10 most requested newspapers in the library? Would that satisfy the prisoner's First Amendment concerns? Well, your honor, that certainly would be a closer case than the one here. However, I think that there is a good argument that that would not satisfy the First Amendment right because what this court has stated in the Sizemore case is that the right is a right to receive and read newspapers. And I think implicit in that is the idea that there is a right to subscribe to a newspaper and to receive the newspaper, subject, of course, to reasonable restrictions. So I would certainly agree that that is a much closer case than this one, but I think at a minimum there is a good argument that if Mr. Miller were not allowed to subscribe to a newspaper of his choosing, subject to reasonable restrictions, that that would not satisfy the First Amendment right. Oh, sorry, go ahead. I would just note also on that point that that would not have satisfied Mr. Miller's personal interest in this case, which was, of course, learning about the law and receiving a legal newspaper. Can I ask you a question on that front? I'm sorry, Judge Robner, go ahead. No, no, no, no, go ahead, please. Why was it appropriate for the district court to pass upon the constitutionality of a newspaper ban, as we're talking about now and as you opened your argument with, when Mr. Miller's complaint was much narrower than that, focused on the failure to receive a subscription to the Chicago Daily Law Bulletin? Well, I think that that obviously was what Mr. Miller requested, but I believe in his amended complaint, Mr. Miller did state that he was taking issue with the broader policy of not allowing prisoners to have subscriptions entering the prison. So I do think that Mr. Miller described the applicable legal standard. He also cited a number of the precedents in his pro se pleadings that involved newspaper bans. So I think that while Mr. Miller may have, when he was pro se, framed the issue slightly differently, I do believe that ultimately, even in his pro se complaints, he was raising a challenge to the policy. Well, Mr. Birnbaum, he's seeking something which could be loosely described as a legal publication, right, as opposed to a newspaper? I believe that the newspaper was a, it's a legal newspaper. So it's certainly not a general interest newspaper, but in form, it certainly, it appears to be a newspaper. It is printed on newspaper print. Wasn't his interest in gaining possible legal advice? As opposed to finding out what's going on in the world generally? Well, I think that Mr. Miller was, I think it's slightly broader than that. I think that Mr. Miller was interested in learning about the law. He wanted to learn about cases, about doctrines, about how the law works, in hopes that that information would have helped him in dealing with his criminal proceeding. And I think that the reason he wanted a legal publication is because he thought, inferring from the record, that receiving that kind of information on a regular basis would allow him to develop the kind of knowledge that would be helpful to him. I think that what you just said is completely fair. And so what I'm concerned about is why didn't the district court, you're not going to know the answer to that, why didn't the district court answer that question? That's what his lawsuit was about. And it may be that he has a decent claim. But it didn't, I don't know why the complaint that he brought required the district court to pass upon the constitutionality of a newspaper ban. Judge Flom, you know, said the newspaper of general circulation. That's not why he sued. He sued because he wasn't getting a copy, at least as I read the materials, of the Chicago Daily Law Bulletin, when the prison's policy, by its terms, allowed inmates to receive a subscription to prison legal news. So I don't know why that wasn't the question that was, you know, that was resolved in the district court. Well, I think certainly if ultimately the district court addressed something that, in your Honor's view, was not actually the policy at issue, that potentially would be a reversible error. And that would be a reason to send the case back to the district court. However, I do think that even in this case, the district court did characterize what was at issue, made a factual finding in a sense, that there was a newspaper ban in this case. And it's true, as your Honor mentioned, that the written policy does not specifically state that newspapers are banned. However, defendants in this case have acknowledged that the way it was interpreted in practice during the relevant time period was that Mr. Miller or any inmate could not receive a newspaper because newspapers were considered. Let me ask you the question a different way. Sure. What is the proper way to formulate the PRON 2 qualified immunity question? I think that… If you had to draft it, how would you write it? I think that the second prong under qualified immunity is whether the right at issue was clearly established. What's the right at issue? I think that the… Certainly, we would argue or we would contend that the right at issue is as this court defined it in Sizemore, which is a right to read and receive newspapers. Obviously, I understand that your Honor believes that Mr. Miller may have been contending that he had a narrower right in this case. But ultimately, that is the right that the district court articulated was at issue. Do you know if the list of the magazines that he cites are the only magazines that prisoners are allowed to have or are these just the ones to which the prison subscribes? And thus, the prisoners have access to those as a public resource. Your Honor, my understanding is that the list of magazines that was supplied by defendants was during the relevant time period, which is 2012, the totality of magazines that prisoners were allowed to review. During the relevant time period, prisoners could not have had a subscription to a magazine either. I believe the prison has since changed their policy. It's slightly broader now, but that is as it was during the relevant time period. Well, because of the change in the law or because of the movement in the law. I believe that may be correct. And in addition, I believe part of the reason that the policy was changed was as part of a settlement of a lawsuit that was brought by prison legal news alleging prison legal news was not being distributed. Now, if I could, I'd like to turn to a couple of points related to the case law. And the first is that this court has already struck down a newspaper ban in a case that remains binding precedent. And that case is Kincade v. Rust. Kincade involved a ban on newspapers, non-pictorial magazines, and hardcover books. And in that case, this court acknowledged that deference normally is due to prison administrators. And it also acknowledged that prisoner rights should be balanced with the legitimate goals of confinement. But notwithstanding that, this court concluded that the newspaper ban at issue in that case violated the First Amendment. Now, much like the facts in this case, the defendants in Kincade attempted to justify the newspaper ban by asserting that prisoners could use newspapers to cause mischief, such as starting fires and jamming plumbing. And in that case, this court rejected that argument because those harms could be caused by the exact same kinds of items that detainees were permitted to have. Now, as I mentioned previously, Kincade is also not the only time that this court has cast out newspaper bans. In the Sizemore v. Williford case, which was decided just a few months after Turner, this court stated that prisoners have a First Amendment right to read and receive newspapers and periodicals. Now, those cases were decided over 30 years ago, but in the intervening time, this court has never suggested that they have become invalid or anything less than good law. Now, the second point that I would like to make is that it's also well-established nationwide that prisoners have a right to receive newspapers under the First Amendment. Importantly, both Illinois state regulations and also federal regulations allow prisoners to subscribe to newspapers and to receive them. And there are also, as we cited in the briefing, dozens of cases, or I would say certainly over a dozen cases, that have reviewed newspaper bans and have concluded that they are not valid. So there is no controversy in the case law here. Virtually all of the cases point in the same direction. And the final point that I would like to make is that there's no reason to think that a reversal here would significantly burden JCDC or any other prison. At this point, this is a damages case, so the court doesn't need to worry about fashioning a new policy. Additionally, we also agree that there can be reasonable restrictions on the right to receive newspapers. What would the limit be? What if we were to suggest that you could only receive one national publication and one regional publication? Would that be, Mr. Birnbaum, an acceptable answer to the First Amendment inquiry? I think that there is a good argument that that would not be sufficient. Well, then, is your position that a prisoner could have subscriptions to 25 newspapers? No, Your Honor. I think we would certainly agree that there can be reasonable restrictions on the right to subscribe. Well, that's what I'm trying to frame up here. I think that… What would constitute, in your view, a reasonable restriction without violating the First Amendment? Well, the prison could potentially allow the prisoner to subscribe to one newspaper or allow the prisoner to keep one newspaper in his cell or require that the newspapers be kept outside of the cell, things of that nature. And indeed, I believe in the federal regulations, there are restrictions along those lines. Well, if you were successful in this lawsuit and he could receive the law bulletin, would he then… Would that satisfy his First Amendment request to get a newspaper? And we would face another lawsuit if he wants another publication? I think that with respect to this case, if Mr. Miller were allowed to subscribe to the Chicago Daily Law Bulletin and receive one copy of it daily, that would satisfy his interest in this case. Of course, this is, at this point, a damages case, so that issue is not squarely presented. But, yes, I believe that would satisfy it. Do you want to reserve some time? Yes, Your Honor. I'll reserve the remainder of my time. All right. Thank you, Mr. Birnbaum. Mr. McTerms? Good morning, Your Honors, and may it please the Court. I'm David Matthews. I represent the defendants in this case. One of the plaintiff's themes in their reply brief is that the defendants are complicating a very simple case that's just about newspapers. I would respectfully suggest to this Court that the opposite is true, that the plaintiffs… It's a more complicated case. Like in any jail restriction case, it's a nuanced case, and the plaintiffs are hoping the word newspaper leads this Court to gloss over those complexities. I'll start by going to the issue of what the actual claim is here and some of the questions raised by the Court of Mr. Miller's counsel. What did Mr. Miller want his law bulletin for? What was he looking to get? Here, I would direct the Court to Mr. Miller's deposition, pages 56 through 59, where he talks about he wants the law bulletin not to keep up with the news or to participate in the marketplace of ideas, but for help fighting his case. One could almost question whether this is some sort of accent to the Court's case, but what's very important is Mr. Miller is asked, have you seen prison legal news? And he has. He's even asked what's in it, and he goes to describe what's in it. And then he's asked, does prison legal news contain the same basic kind of information that you were looking to get out of the law bulletin? And he agrees with that as well. So here is, if we want to look at adequate alternatives under Turner, for what he's looking for from his own mouth, a pretty good alternative, and yet he never even ordered it. He also didn't take the answer. Look, what if the prison decided that the only news magazine, for instance, that was going to allow was The Nation or perhaps Breitbart News? Can we really say that what we've got here is some sort of content-neutral rule when the prison dictates from which sources a prisoner can get news? I mean, as long as it's not obscenity or, you know, I think the sort of thing that Judge Flom is worrying about. Judge, I would say first of all that if the prison only allowed newspapers or magazines from one ideological viewpoint, that's content-based, and I have a hard time seeing how that would be constitutional. I would also say that that's not what we've got here. For one reason, you have numerous news magazines. You also have the television news. And also, the inmates at JCDC, even before the policy changed, were allowed to get newspaper clippings, a clipped article from what someone could have sent them. Right, but is getting news from a weekly or monthly news magazine or even the TV, which could be set on, you know, one channel only for all we know, I mean, would that really be the same as getting daily news from a newspaper? Well, no, it wouldn't necessarily be the same. I mean, certainly if you get a copy of any daily newspaper, you'll learn more, but that's not the standard under the Turner in the cases applying the First Amendment. It's not as much news as one can get on the outside. And I get the court's concern. I think there would be a very legitimate, at least what I understand to be the court's concern, I don't want to put words in Your Honor's mouth, of any kind of ideological or viewpoint discrimination. That would be a serious problem. But that's not what anyone is, the plaintiff hasn't argued that. The district judge didn't find that. I don't think there's any evidence of that in this case. Mr. Matthews, if you look at the chief of the facilities affidavit, as you know, in that particular affidavit, the chief says that prison legal news was allowed if it was subscribed to. Correct. The point that you just made there. And presumably that's because it's a legal publication. And is that a fair inference? I think that's, you know, it's not in the record, Your Honor. I think that would be a reasonable inference. Right. And so what I don't understand is how you square depriving, I understand the point you made about an alternative, you know, it's an alternative. But you could have a situation here where someone in the wing has a personal subscription to prison legal news and tells Mr. Miller, this is outstanding, you ought to get a subscription to something like this. He said, lo and behold, I have one, to the Chicago Daily Law Bulletin, but they won't drop it off. What sense does that world make? Well, that world makes a lot of sense if you understand the difference between the way a monthly news magazine of any sort, including prison legal news, comes, how often it comes, versus a daily newspaper that comes every day and contains a lot more paper. Really, the plaintiffs make a lot of arguments in this case about the security concerns that the jail cites and says, well, the inmates can use the handbook, they can use their copy of a religious text. So it's the frequency that you're going to defend this on? The frequency and the volume together. So the frequency, if it only comes once a year, if it comes every day but it's one sheet, that might be equivalent to coming once a month, but 50 sheets. There's an old quotation from Napoleon, it's talking about the army, but he says, quantity has a quality all its own. And in this case, a significant, not the only, but a significant part of what led the jail administrator in his professional judgment to not allow newspapers is the sheer quantity of paper from a daily newspaper. I do want to address one issue on the qualified immunity. I need to make a clarification to the court about a case that I cite. So in my qualified immunity argument, I point to two different conflicting opinions in the Central District of Illinois at the time. And as to the one that upholds the ban, I make a statement on page 39 of the brief that that ban was part of a jail policy that banned all newspapers and magazines and everything that didn't come from the Pekin Public Library. The nature of that policy doesn't come from the opinion that I cite. It comes from an earlier opinion in the case, which is actually this court's opinion, and it's 137 Federal Appendix 880, where it's talking about the policy that then remands the case because their initial decision was based on exhaustion. And there this court gives more detail as to what the policy was. It's the same case, it's the same opinion that then leads to the case that I cite. So I want to clarify that for the court. As to qualified immunity and as to the right at issue, I disagree with the plaintiff's contention that defining the right is defining the right as the right to read newspapers. That's defining the right more or less as to what the plaintiff wants is defining it too narrowly. And I would emphasize that the U.S. Supreme Court has never said that inmates have a right to read newspapers and certainly not, as Mr. Miller is claiming, the newspaper of their choice. This court has never said that in an opinion that specifically cites Turner. So Kincaid, which I'll address a good deal in my brief and will mention again in a moment, is obviously pre-Turner. Sizemore, which the plaintiff argued about here, is a few months or so after Turner, but it never mentions Turner and also the language that it uses is dicta. So there is the question of clearly established. It's not clearly established. You have a few unpublished court of appeals cases, you have a few district court cases here and there. Really, the plaintiff's best case, by far, is the district court opinion in Koger v. Dart from 2015. That is by far their best case because it does go through the Turner factors, it does address a newspaper ban. However, I would underscore that even their very best case, by far, Koger goes out of its way to say that Kincaid is not controlling. Koger recognizes, not me on behalf of the defendants, but their best case, that Kincaid is not controlling because it's before Turner and also because the ban at issue in Kincaid is broader. There seems to be an attempt to draw some sort of a distinction between pictorial magazines and non-pictorial magazines. Truth be told, virtually all magazines have pictures in them. So virtually all magazines would have been banned under the policy at issue in Kincaid, while here... Yeah, but cases about photographs and, you know, role-playing games like Dungeons & Dragons are not the same as cases about newspapers. Judge, that's... Certainly a reasonable person could infer that. There's absolutely... There's a common-sense argument that Dungeons & Dragons doesn't have the same First Amendment weight as a newspaper has. But I would make two responses to that. The first is those cases, not just in terms of what's at issue, but in the reasoning there and the evidence that's accepted, the deference to the one gang specialist who said this could cause a problem, even though you had a bunch of inmates saying, we don't think it's a problem, we've all been in jail a long time, we've never heard of it causing a problem. The other point I would make, Your Honor, in response, is that even though certainly there's a common-sense argument that, well, D&D doesn't matter, that's not in the opinion. The opinion never says that. And I would submit that a reasonable jail administrator could just take Singer at face value and not draw a distinction based on Dungeons & Dragons. And given that, that would only strengthen my argument for qualified immunity in that it would not be clear to every reasonable jail official that Singer came out the way it did just because it was D&D and not because it would apply at any time the First Amendment right was at issue. Well, you know, of course, it seems to me there were plenty of cases in 2012 that indicated that a complete ban on newspapers, you know, would not be constitutional. There are cases that deal with policies that, that's correct. I would point out to the court, however, that most of those cases, such as the Mann case that the plaintiffs point to in the Fifth Circuit, various other cases, that they cite that rely on Mann. The Emory case, which is a 2018 case, it's newer, but they all deal with broader policies. So it's not just a ban on newspapers, it's a ban on newspapers and magazines and sometimes other things. And I would also point out that those are mostly out of district cases and or unpublished cases and that under what the standard is for clearly established, that's not enough. Could we talk a moment, please, about the fact that Mr. Miller never received any notice that his newspapers were being confiscated and that he had no opportunity to be heard and the paper seems to have been confiscated every single weekday for almost 10 months. Well, obviously we can talk about whatever the court wants to talk about, but yes, I'll be happy to address that. And what Your Honor is articulating is a very good procedural due process argument. However, under this court's precedent of Stewart v. McGinnis, even when something happens and the inmate claims there that it's predictable, so predictable here, he's claiming that. Contrary to the policy, he's claiming that too. His procedural due process claim, he doesn't have one because he has a remedy in Illinois State Court. So could he have had a remedy for the 270, excuse me, yeah, I think it's 279 is the annual subscription at the time. I'm not conceding that that's, that the no notice was actually given, but certainly on summary judgment, this court can assume that, taking the facts in his favor. And that would be a very strong Illinois tort claim, and to that I would respond to Your Honor that Mr. Miller in his response to the grievances when he finds out about this, two things are interesting. One, the remaining law bulletins that come after he finds out are reserved for someone to pick up and nobody ever comes, which maybe casts some doubt on how badly he wants them. But also he himself mentions that he wants to file a tort claim in the Illinois State Court, which he could do, so he knows he could do it, and he didn't do it. So that is why, kind of the more sympathetic fact for him there doesn't lead to a constitutional claim in this case. I've got about a minute left, so what other questions do your honors have? I think, are you asking something Judge Rovner? Judge Rovner, I'm bad with technology. No, no, I'm silent. Okay, I apologize. Thank you. Ultimately, Your Honors, the U.S. Supreme Court held in the Florence case that in order for a plaintiff to challenge a prison regulation, whatever it is, they need to point to substantial evidence in the record to overcome the deference that prison administrators have. And here the plaintiff has not pointed to substantial evidence in the record. This is true as to the issue of resources. I talk about this in my brief. We presented certainly more evidence than was true in the Singer case or in the Jackson case. It's true on the security concerns as well. And for those reasons, I would ask this Court... Oh, the security concerns, forgive me, but it seems to me that clothes, magazines, Bibles, mail, I could go on, can be used to clog pipes, cover windows, and you've got USA Today coming to the pod. That could be used to start fires, et cetera, et cetera. I do not... I have a real problem with that argument. Judge, I hear Your Honor's concerns. All I'll say is my time is expiring. Besides that, I do address this in the brief. It's true that an inmate can use just about anything. However, the amount of opportunity for mischief in a daily paper to the inmate as opposed to sheets or a Bible where you only have one or USA Today that is in the general pod, that's a different situation. Thank you. Thank you, Your Honors, for your time. All right. Thank you, Mr. Mathews. Mr. Birnbaum. Your Honors, I just have a few points in response to opposing counsel's argument. First, I believe there was some suggestion that some of the cases Mr. Miller cited in his briefs are distinguishable because those cases also banned magazines. A number of the cases that were cited were cases in which prisoners actually did have some access to magazines. I believe that the Coger case and the Hutchings v. Quorum cases are instances of that. In addition, in the Green v. Farrell case, the prison or the defendants in that case argued that a ban should be upheld because it didn't ban magazines, and the Fifth Circuit concluded that distinguishing between newspapers and magazines made the ban even less rational. Mr. Birnbaum, let me ask you to react to a concern that I have with approaching the qualified immunity question that way. Suppose that your body of clearly established law, in my hypothetical, comes from two district courts, one in Hawaii and one in Alaska, and the legal point in question when you take stock of the cases, the way that it stacks up is there's 12 decisions, 11 of them go your way, and only one of them goes Mr. Matthews' way. Is that body of law clearly established law for somebody running the jail in Kankakee County, Illinois? I think that potentially it could be. What the Supreme Court has stated in the Wilson v. Lane case is that a, quote, consensus of cases of persuasive authority can be sufficient to overcome the qualified immunity barrier. So certainly if there were one or two cases outside of this circuit, that might not be enough. But again, this situation, there is considerably more case law than that. There are cases from a number of different circuits as well as case law from this circuit. I see I only have a few more seconds, but just a few more points. First, on the prison legal news issue, there is some question in the record about whether the prison legal news was reasonably available. Mr. Miller stated in his deposition that he never saw it before 2014. There also was some attempt to distinguish daily versus monthly newspapers, but that concern can be mitigated through some of the mechanisms that I believe I described previously. Thank you, Your Honor. Thank you, Mr. Birnbaum. Thank you, Mr. Matthews. Mr. Birnbaum, you and, of course, Mr. Levenstan, who is a regular supporter of appointed cases in this court, have the additional thanks of the court for accepting this appointment and ably representing Mr. Miller. Thank you. The case is taken under advisement. The court will take a 10-minute recess.